UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

ROGER KERR,

    Plaintiff,

v.

FRANK J WEIKERT, Rock Island Sheriff Deputy (retired), in his Individual capacity,

    Defendant.

No. 4:13-cv-04102-SLD-JEH

## ORDER

This 42 U.S.C. §1983 suit arises out of an incident at the Rock Island County Courthouse which took place on November 14, 2012. Plaintiff Roger Kerr attempted to enter the building wearing a hat, which was against courthouse rules, resulting in a fracas with the court security officers that ended with Kerr on the floor and briefly handcuffed by Deputy Sheriff Frank Weikert. Before the Court is the Defendant's Motion for Summary Judgment, ECF No. 22, on the last remaining claims: Count I that, in violation of the Fourth and Fourteenth Amendments, Weikert used excessive force against Kerr and falsely imprisoned him; and Count III the pendent claim that Weikert's actions amounted to an intentional infliction of emotional distress ("IIED") under Illinois law. Defendant's Motion is DENIED with respect to Count I. Defendant's Motion is GRANTED with respect to Count III.

## BACKGROUND

On November 14, 2012, Roger Kerr went to Rock Island County Courthouse to pay a monthly installment of fines. Pl. Aff. ¶ 3, Pl. Resp. Ex. 1, ECF No. 25. When he entered the

courthouse, Kerr was wearing a hat. Unbeknownst to Kerr, a new rule forbade wearing a hat in the courthouse. On that day, there were no signs posted in the courthouse to warn patrons that hats were not allowed. Pl. Aff. ¶ 5.

Bailiff Gary Loy told Kerr to remove his hat. Weikert Dep. 10. ECF No. 22-1. Kerr voiced his disagreement with the rule. Weikert alleges that Kerr then became agitated, i.e., he started yelling, cursing, and arguing with Bailiff Loy about having to remove his hat. Weikert Dep. 9–11. Although Kerr admits he was upset at this point, he denies cursing or yelling during his conversation with Bailiff Loy. Pl. Aff. ¶ 7.

At that time, Defendant Deputy Sheriff Frank Weikert was about fifteen feet away, training a new bailiff on use of the X-ray machine. Weikert Dep. 9:11–21. Weikert, upon hearing Loy and Kerr exchanging words, walked over to the metal detector where Kerr was attempting to enter. *Id.*, at 13:15–19. As Kerr made his way through the metal detector, he continued to express his discontent with the hat rule. Loy Dep. 9:9–10:15. Bailiff Loy described Kerr's behavior as disruptive—he was "creating a stir" and making "a lot of noise," Loy Dep. 15:22–16:2, ECF No. 22-2, but Kerr alleges that he simply stated something along the lines of "Are you'll making things up as you go?" Sheriff Compl. 2, MSJ Ex. F, ECF No. 22-6. Weikert denied Kerr entry, and directed him that he was "not coming in today." Weikert Dep. 13:17–19.

The courthouse has one main entryway and one main exit.  The exit is across a rotunda from the entrance.  Kerr alleges that he started to walk toward the doors across the rotunda—the normal way to leave the building. Weikert, having denied permission to enter the building, positioned himself in front of Kerr to block his path. In his complaint to the Sheriff's Office, Kerr wrote "I tried to go around him, he said 'I'll take you across to the county jail.' I said nothing and tried to go around him." Sheriff Compl. 2. In his affidavit, Kerr averred that he tried

to walk around Weikert as Weikert was blocking his way and holding his cane, "but [Weikert] would not let me pass him and shoved my own cane into my chest." Pl. Aff. ¶¶ 9-10. Weikert testified that he does not remember handling the cane or holding it against Kerr's chest. Weikert Dep. 23–24.

Next, Weikert either "forcefully tackled" Kerr, Am. Compl. ¶ 25, ECF No. 9, or grabbed Kerr's elbow and arm and spun him around. Pl. Aff. ¶ 11. Weikert stated that he placed a hand on Kerr's elbow, applying minimal force (a "2.5" on a scale of 1-10) in an attempt to turn him towards the closest exit. Weikert Dep. 22. After turning around, Kerr fell to the ground, Am. Compl. ¶ 25, though it is disputed whether the fall was caused by Weikert's touch, *id.*, or by Kerr losing his balance while pulling away from Weikert. Weikert Dep. 16:3–10.

After Kerr was on the ground, Weikert twisted Kerr's arm in order to place a handcuff on Kerr's right wrist and, using his knee, applied some level of pressure to Kerr's side, though the level of pressure is in dispute. Am. Compl. ¶ 26 (alleging Weikert "forced" his knee into Kerr's rib cage); Weikert Dep. 30:17–18 ("I may have put my knee near him as standard practice to put some weight on him. . ."). After an indeterminate period of time, Weikert removed the handcuff and asked Kerr whether he needed an ambulance. Weikert guessed that the handcuff was on Kerr for "less than a minute," Weikert Dep. 18, though Kerr claimed that it was longer than a minute. As this was going on, Kerr told Weikert that he was injured. Another bailiff approached and asked Kerr whether he needed an ambulance. Pl. Aff. ¶ 13. Weikert then removed the handcuffs and Kerr told both the bailiff and Weikert that he did not need an ambulance. Pl. Aff. ¶¶ 15–16. Kerr remained on the floor for a few minutes, refusing assistance from the officers, before getting up and leaving the building. Am. Compl. ¶ 28. Kerr alleges that since the incident he

became paranoid and suspicious of the police. Pl. Aff. ¶ 17. Kerr also alleges that he developed problems sleeping since the accident. Pl. Aff. ¶ 19; Pl. Medical R. 1-2, Ex. 4, ECF No. 25.

## DISCUSSION

### I.   Legal Standard on a Motion for Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Magin v. Monsanto*, 420 F.3d 679, 686 (7th Cir. 2005) (citing Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence and assess the truth of the matter but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). There can be no genuine issue as to any material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where the parties' versions of events differ substantially, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In qualified immunity cases, this usually means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378. The court is not required to accept unwarranted factual inferences. *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott*, 550 U.S. at 380.

This does not mean, however, that a plaintiff's "self-serving, uncorroborated" affidavit—one that puts forth a very different version of events than the defendant officers'—is insufficient to defeat a motion for summary judgment. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). When the affidavit is based not on "speculation, intuition, or rumor" but a detailed factual account of a first-hand experience, it is an acceptable method for the non-moving party to present evidence of disputed material facts. *Id.* at 773. The examining court must be careful to weigh the sufficiency of the evidence, not its credibility. *Id.* at 771. When the material facts presented in such an affidavit contradict those presented by the moving party, summary judgment must be denied. *Id.* at 773.

## II.   42 U.S.C. 1983 and Qualified Immunity
### a. 1983

"In order to state a claim under § 1983, a plaintiff must sufficiently allege that (1) a person acting under color of state law (2) deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States." *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745–46 (7th Cir. 2010).

### b. Qualified Immunity

"Qualified immunity is an entitlement to avoid trial." *Jones v. Clark*, 630 F.3d 677, 679 (7th Cir. 2011). It shields officials, including police officers, from harassment, distraction, and liability when they perform their duties reasonably, while ensuring that public officials are held accountable when they exercise power irresponsibly. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). An "official's right to immunity turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right, and second, whether the federal right at issue was clearly established at the

time that the alleged violation occurred." *Jones*, 630 F.3d at 680 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). If the plaintiff cannot establish that the facts, "taken in the light most favorable to [him], show that the defendant violated a constitutional right," summary judgment for the defendant is appropriate. *See Jewett v. Anders*, 521 F.3d 818, 822–223 (7th Cir. 2008).

The plaintiff can meet this burden by showing "that there is a clearly analogous case establishing a right to be free from the specific conduct at issue or that the conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (internal quotation marks omitted). "Although it is not necessary that a prior case address the precise factual situation confronting the officer, the unlawfulness of the officer's action should be clear in light of pre-existing law." *Jones by Jones v. Webb*, 45 F.3d 178, 183 (7th Cir. 1995). The inquiry into whether a defendant violated clearly established law often relates to the sufficiency of the evidence supporting the underlying constitutional violation. *See Jones*, 630 F.3d at 679. For that reason, the Court will analyze the applicability of qualified immunity in conjunction with its analysis of whether genuine issues of material fact exist as to the alleged constitutional violation in each count.

### III. Count I: Use of Excessive Force

Count I for use of excessive force under the Fourth and Fourteenth Amendments arises from Kerr's allegations that (1) Weikert blocked Kerr from exiting the courthouse while holding Kerr's cane up and forcibly blocking his way (2) Weikert grabbed Kerr and forcefully tackled him to the ground and (3) Weikert drove his knee into Kerr's side while applying handcuffs to one of Kerr's wrists. Am. Compl. ¶40.

### a. Legal Standard

A successful claim under 42 U.S.C. § 1983 requires that a plaintiff identify the specific constitutional right allegedly infringed by the challenged application of force. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). The claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard. *Id.* at 394. When the excessive force claim arises out of an investigatory stop, "it is most properly characterized as one invoking the protections of the Fourth Amendment" freedom from unreasonable seizures of person. *Id.* Greater specificity in identifying the conduct at issue is required to determine whether the actions taken by the officer violated a clearly established right for the purposes of a qualified immunity defense. *Id.*

A reasonableness standard governs evaluation of a plaintiff's Fourth Amendment claim of use of excessive force during an investigatory stop. *Stainback v. Dixon*, 569 F.3d 767, 771–72(7th Cir. 2009) (citing *Graham*, 490 U.S. at 395). The right to make an investigatory stop "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. The nature and extent of the force that may be used depends upon the circumstances surrounding the stop, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009).

Even "one violent push and poke" can constitute excessive force where there is no provocation. *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467 (7th Cir. 1997); *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1119 (N.D. Ill. 1997). Further, "it is well established that a police officer may not continue to use force against a suspect who is subdued and complying

7

with the officer's orders." *Johnson*, 576 F.3d at 660; *see Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 686 (7th Cir. 2007).

### b. Analysis

We begin with the allegation that Weikert blocked Kerr from entering the courthouse using Kerr's cane. Kerr cannot establish that he had a right to enter the courthouse. When a sheriff is tasked with "custody and care of the courthouse," he has the "authority to issue reasonable rules for maintaining the safety and decorum of the building." *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995). The Seventh Circuit has found that arrest or ejection from the courthouse for defiance of reasonable courthouse rules is not a constitutional violation because courthouses have legitimate security concerns. *Ryan*, 45 F.3d at 1092–93 (holding that plaintiff's arrest for defying the courthouse's reasonable "no mask" rule was not a constitutional violation, and officer was entitled to qualified immunity). The Rock Island County Courthouse's rule against hats was reasonable. Aside from hat removal as a traditional signal of decorum, the wearing of hats may present a security threat. As in banks and other secured institutions, hats are barred because individuals in hats may be able to obscure their identities from security personnel or avoid identification on security cameras.

Even taking the facts in the light most favorable to Kerr and presuming that he did not yell or curse at the officers, he was argumentative concerning his disagreement with the rule, had made it past the metal detector, and, in his own words, "tried to walk around Officer Weikert" into the courthouse. Pl. Aff. ¶¶ 6, 10. Though Kerr may have subjectively thought he was following an order to exit to the far side of the rotunda, it was reasonable for Weikert to believe that Kerr was attempting to enter the courthouse, against his order and in violation of courthouse rules. *Stainback*, 569 F.3d at 771. Weikert's choice to physically block Kerr's entry into the

courthouse, including pushing toward and touching Kerr with his own cane, could not reasonably be construed as excessive force beyond what was necessary to effectuate Kerr's expulsion from the courthouse. *Graham*, 490 U.S. at 396.

The next instance of alleged excessive force occurred when Weikert attempted to steer Kerr toward the front entrance. Kerr's amended complaint alleges that he was "forcefully and unlawfully tackled" to the ground, Am. Compl. ¶ 40. His report to the Sheriff's Office maintained that he tried to walk around Weikert toward the back exit, and the next thing he remembered was "falling backwards," with no mention of physical contact. Sheriff Compl. 2. Kerr's Response to Defendant's Motion for Summary Judgment states that Weikert "took hold of Plaintiff's arm and elbow and turned him towards the door," Pl. Resp. 5, ECF No. 25, and Kerr's affidavit states that Weikert "grabbed [his] arm and spun him around." Pl. Aff. ¶ 11.

This lack of consistency in Kerr's descriptions of the incident makes it difficult for the Court to assess precisely how much force was used according to Kerr—forceful tackling is very different in degree than grabbing or twisting an individual's arm. The weight of Kerr's evidence appears to support the finding that Weikert grabbed Kerr's arm and elbow, with some force, and attempted to turn Kerr's body toward the front entrance. This version is corroborated by the testimony of bailiff Loy, who witnessed the event: "Deputy Weikert put a hand, I believe, on his arm or shoulder and advised him that he was going to, again, have to leave." Loy Dep. 11:23–12:1.

Even if Weikert did, indeed, forcefully grab and twist Kerr's arm and elbow, the result is the same. At the time Weikert grabbed Kerr's arm, Kerr was still moving toward Weikert and into the courthouse. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," and Weikert's decision to grab Kerr's

9

arm and guide him out when it appeared that he was attempting to enter the courthouse is within the "calculus of reasonableness" expected of police. *DuFour-Dowell*, 969 F. Supp. at 1119 (quoting *Graham*, 490 U.S. at 396–97).

The same does not hold true for Weikert's decision, once Kerr was on the ground, to hold Kerr down with his knee while twisting his arm and applying a handcuff. At the time of his fall, Kerr claims that he was not resisting, and Weikert's testimony corroborates that Kerr simply lost his footing. Weikert Dep. 22:24-25. Weikert admitted that "Mr. Kerr did not pose much of a physical threat" and that his purpose in handcuffing Kerr was to regain control while Kerr calmed down. Further, Kerr's alleged crime (indirect criminal contempt) was not severe. Weikert acknowledged that he "may have" used his knee to "put some weight on" Kerr, a standard practice for handcuffing a subject. Weikert Dep. 30:15-24. Kerr alleges that the pressure from Weikert's knee and on his arm was strong enough to cause him significant pain to his back, arms, and legs, and has required continuing pain management via over the counter medications. Kerr informed Weikert during the encounter—while Weikert remained on top of him—that he was injured.

Construing these facts in Kerr's favor, sufficient evidence has been presented such that a reasonable jury could find that Weikert used excessive force that was not reasonable in the situation. *See Payne*, 337 F.3d at 778–79 (holding that aggressively handcuffing a woman who was not resisting arrest, not attempting to harm anyone at the scene, and charged with only minor offenses was not a reasonable use of force); *Holmes*, 511 F.3d at 686. Thus, the first prong of the qualified immunity test is met, *Jones*, 630 F.3d at 680, since Kerr has alleged facts that, when considered in the light most favorable to him as the non-movant, support the finding that Weikert used excessive force.

10

Further, in regards to Weikert's defense of qualified immunity, Kerr successfully argues that sufficiently analogous caselaw existed at the time of the incident to show that his rights were clearly established. Therefore, Weikert's actions are not protected. In November 2012, when the events at issue occurred, it was well established that it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes. *Payne*, 337 F.3d at 780. It was well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. *Johnson*, 576 F.3d at 660; *Holmes*, 511 F.3d at 686. It was also clearly established that a police officer's use of force should adapt proportionally to changing circumstances. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is reasonable only when exercised in proportion to the threat posed, and, as the threat changes, so too should the degree of force."(internal citation omitted))

Kerr was lying on the ground after having fallen down. There is no evidence to show that Kerr was disobeying Weikert's orders while he was on the ground, and, in fact, Weikert testified that Kerr was "calming down" as he was putting the handcuffs on. Weikert Dep. 17:14–15. Weikert acknowledges that Kerr did not pose a safety threat to Weikert or other officers. Weikert Dep. 30:24–25. Furthermore, if Kerr was suspected of committing any crimes, they were minor. MSJ 18 (alleging that Kerr may have committed "indirect criminal contempt").  Thus, taking the facts in the light most favorable to Kerr, Weikert could reasonably be found to have violated Kerr's clearly established right to be free from excessive force once he was subdued on the ground.

## IV. Count I: Plaintiff's False Imprisonment Claim

In Count I, Kerr claims that he was falsely imprisoned in violation of the Fourth and Fourteenth Amendments because Weikert briefly handcuffed his right wrist after he fell to the ground, without authority or legal justification. Am. Compl. ¶ 40.

### a. Legal Standard

The Fourth Amendment provides latitude for officers to "engage in brief investigative stops that need not be supported by probable cause, but instead by reasonable suspicion that the target of the stop has committed, is committing, or is about to commit a crime." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 26 (1968)). "When an encounter shifts from consensual dialogue to an investigatory stop, the officer must be able to point to specific facts that give rise to reasonable suspicion that the person stopped is involved in criminal activity." *Jones v. Clark*, 630 F.3d 677, 682–83 (7th Cir. 2011). When evaluating the reasonableness of an investigatory stop, the court examines first "whether the officer's action was justified at its inception and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Jewett*, 521 F.3d at 824 (internal quotation marks omitted).

"The line between a lawful *Terry* stop and unlawful arrest is not bright." *Askew*, 403 F.3d at 507. "Once police have the reasonable suspicion required to justify an investigatory stop, they may use reasonable means to effectuate that stop." *United States v. Felix-Felix*, 275 F.3d 627, 636 (7th Cir. 2001). A purported *Terry* stop rises to the level of an arrest, which must be supported by probable cause, if an officer's actions are unreasonable under the circumstances and the facts do not justify a fear for personal safety on the part of the officer. *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (citing *Jewett*, 521 F.3d at 824–25). The court "must also consider the defendant's own actions in resisting an officer's efforts." *Jewett*, 521

F.3d at 825 (internal quotation marks omitted). Police are permitted to graduate their response to meet the demands of evolving circumstances. *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002).

The Seventh Circuit acknowledges a "multifaceted expansion of *Terry* [that] . . . has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons, and other measures of force traditionally associated with arrest than with investigatory detention." *Askew,* 403 F.3d at 507 (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224–5 (7th Cir. 1994)). Courts have examined closely the use of handcuffs during investigatory stops, particularly because the practice "substantially aggravates the intrusiveness of a *Terry* stop," and is a restraint on movement generally associated with arrests. *United States. v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989); *see also Rabin v. Flynn*, 725 F.3d 628, 639–40 (7th Cir. 2013) (Rovner, J., concurring) (noting that the Seventh Circuit has a "seemingly broad tolerance" for use of handcuffs during *Terry* stops, but reiterating that "the facts justifying the application of an arrest-like restraint should be concrete and compelling," and are generally only appropriate to protect officers and the public from violence, and to mitigate risk of flight during investigation). In *United States v. Smith*, the Seventh Circuit described the circumstances under which a court should defer on the use of handcuffs during Terry stops:

. . . we have observed that in the "rare" case wherein common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely *only* through the use of handcuffs, "we will not substitute our judgment for that of the officers as to the best methods to investigate." *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993) (quoting *Glenna*, 854 F.2d at 972) (emphasis added).

a. **Analysis**

In defending his instigation of the *Terry* stop, Weikert rests his cause for reasonable suspicion on Kerr's "agitated and hostile" behavior and that he believed Kerr was "attempting to gain entry by pushing by him," MSJ 15–16. Kerr disputes that he was swearing at the officers, though it is undisputed that he attempted to walk toward the back exit, past Weikert, after the officers told him that he was "not coming in today." Weikert Dep. 13:15–19. Weikert reasonably could have believed that Kerr was attempting to enter the courthouse after having been denied entry, making the stop justified at its inception. *See Jewett*, 521 F.3d at 824. However, a stop must also be reasonably related in scope to the circumstances that precipitated it, *id.*, and it is here that a reasonable jury could find that Weikert's actions were unreasonable.

Taking the facts in the light most sympathetic to the plaintiff, a jury could reasonably find that Weikert had no "legitimate interest in safety and security" in handcuffing Kerr once he was already on the ground. Weikert admitted in his deposition that he did not consider Kerr a threat to his safety. Kerr is of advanced age and walks with a cane. It is undisputed that Weikert did not intend to arrest Kerr, and Weikert did not include the fact that he handcuffed Kerr in his incident report. Weikert Dep. 18:19-25. Kerr could not plausibly be deemed a flight risk when the precise behavior Weikert requested was for him to leave the premises; further, once Weikert was on the ground, there was no risk of him entering the courthouse without permission. *Cf. Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992) (handcuffing during an investigatory stop for bike theft was justified because plaintiff threw the bike down, began running, and did not follow orders to stop).

Since well before this incident occurred in 2012, the Seventh Circuit has made clear that handcuffs, despite their growing usage in *Terry* stops, are a tool that should be utilized rarely, when safety and common sense dictate that handcuffs are the "only" safe way to effectuate the stop. *Smith*, 3 F.3d 1088. Though the law provides leeway for officers to use handcuffs when

the circumstances of an investigatory stop present a clear threat to their safety, for instance, when dealing with inherently dangerous crimes like illegal firearm possession, robbery, or drug dealing, the facts of this case cannot reasonably be analogized to cases in which handcuff use was found constitutional. *See e.g. Bowden v. Town of Speedway, Ind.*, 539 F. Supp. 2d 1092, 1101 (S.D. Ind. 2008) ("handcuffing and detaining an unarmed, apparently non-violent person simply because he moved his hands during a frisk clearly violates the Fourth Amendment."). *Cf. Bullock*, 632 F.3d at 1016 (handcuffing plaintiff and placing him in squad car during home search was appropriate where plaintiff was suspected of drug crimes, which are "associated with dangerous and violent behavior and warrant a higher degree of precaution"); *Glenna*, 878 F.2d at 973 (holding that handcuffing the plaintiff was merited during investigative search since police were operating on a tip that he was involved in a drug deal and in possession of several small weapons and an explosive device); *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) (handcuffing an individual who matched the description of an armed bank robber with a semi-automatic rifle, only one hour after the robbery, was reasonable).

When Weikert applied the handcuff, he had, only moments before, witnessed Kerr walking through a metal detector and having his belongings searched. Weikert Dep. 10. He was aware that Kerr carried no dangerous weapons. In fact, Weikert had successfully stopped Kerr's unauthorized entry into the courthouse by grabbing his arm and turning him toward the door, resulting in Kerr's fall, Loy Dep. 15:6-13, clearly indicating that handcuffing Kerr was not the "only" way to safely manage the stop. *Smith*, 3 F.3d at 1094. Thus, Weikert is not entitled to qualified immunity for Kerr's false imprisonment claim.

## V.     Count III: Intentional Infliction of Emotional Distress

In Count III, Kerr alleges that Weikert intentionally inflicted severe emotional distress upon him by tackling the non-resistant and peaceful Kerr, forcing his knee into Kerr's side, and pulling Kerr's arm behind him. Kerr alleges that Weikert's actions resulted in fear, sleeplessness, increased anxiety, and other symptoms of distress.

### a.  Legal Standard

In Illinois,

> three conditions must exist to state a cause of action for intentional infliction of emotional distress. First, the conduct involved must be extreme and outrageous. Second, the actor must intend that his conduct cause severe emotional distress or be aware of a high probability of causing severe emotional distress. Third, the conduct must actually cause severe emotional distress.

*Breneisen v. Motorola, Inc.*, 512 F.3d 972, 983 (7th Cir. 2008); *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). "[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Breneisen*, 512 F.3d at 983 (internal quotation marks omitted). "[T]he tort does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *McGrath v. Fahey,* 533 N.E.2d 806, 809 (Ill. 1988) (quoting Restatement (Second) of Torts § 46, comment d (1965)). "The intensity and duration of the distress are factors to be considered in determining its severity." *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. App. Ct. 1997).

Abuse of authority may contribute to the existence of extreme and outrageous behavior, and police officers are the types of individuals who may be liable for such abuse. *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (citing Restatement (Second) of Torts § 46, Comment *e* (1965)). While all conduct is not immunized, courts give more latitude to a defendant who reasonably believed his objective was legitimate. *Calumet City*, 641 N.E.2d at 507. Even actions

that are unconstitutional are not necessarily extreme and outrageous. *See e.g. Barron v. Sullivan*, No. 93 C 6644, 1997 WL 158321, *12 (N.D. Ill. Mar. 31, 1997) (finding that an officer watching a search subject use the restroom while the search was ongoing may have been unconstitutional, but not "sufficiently extreme to state a claim").

   b. **Analysis**

Most of the symptoms Kerr claims to have resulted from the incident are not sufficient to support a claim of intentional infliction of emotional distress. Shame, fear, worry, and humiliation caused by police action have not been found to meet the stringent test for severe emotional distress. *See Adams*, 684 N.E.2d at 942; *Khan v. Am. Airlines*, 639 N.E.2d 210, 215 (Ill. App. Ct. 1994) (holding that problems sleeping, fear of another arrest, and nightmares were not sufficiently severe to sustain an IIED claim). Psychiatric treatment, hospitalization, or medical prescriptions may indicate severe emotional distress. *Knysak v. Shelter Life Ins. Co.*, 652 N.E.2d 832, 840 (Ill. App. Ct. 1995); *see also Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006) (finding that disorientation and hearing voices were sufficient signs of severe emotional distress).

Kerr's claim fails on the first and second prongs of the test. Kerr has not shown that a reasonable factfinder could find that Weikert's actions were extreme and outrageous, such that they were "beyond all possible bounds of decency." *Breneisen*, 512 F.3d at 983. Even where police have taken actions that were "arguably excessive," a plaintiff must still present convincing facts that the behavior was extreme or outrageous. *See Barron*, 1997 WL 158321, *11.

Kerr has not alleged facts remotely as shocking or as clearly illicit as those cases in which Illinois state and federal courts have recognized intentional infliction of emotional distress. In *Doe v. Calumet City*, the Northern District of Illinois found that an officer's behavior was extreme and outrageous when he insulted a victim of sexual assault whose children were being

held captive by the assailant, and refused to take action to help the children because he did not want to be liable for property damage. *Calumet City*, 641 N.E.2d at 507. Sufficiently outrageous abuse of authority by an officer also includes engaging in illegal acts like eliciting bribes and fabricating evidence to obtain a warrant. *Treece v. Village of Naperville*, 903 F. Supp. 1251, 1259-60 (N.D. Ill. 1995).

It is undisputed that Kerr did not comply with the courthouse rule disallowing the wearing of hats, that he vocalized his discontent with the rule, and that he indicated that he did not intend to follow it. While Weikert's response arguably may have been overzealous—perhaps even unconstitutional—his directive for the plaintiff to leave the courthouse, as well as any bodily contact he made with Kerr, was related to his duties to keep the courthouse free of disruption. Though Kerr may not have been aware of the hat rule, the evidence is not disputed that it existed, and that Weikert's job was to enforce such rules. The record does not indicate that he engaged in extreme abdication of his duties, wildly insensitive behavior, or illicit activities of the type that have been found to be outrageous. *See e.g*. *Calumet City,* 641 N.E.2d at 507–08; *Treece*, 903 F. Supp. at 1259-60.

The encounter was also brief in duration and not particularly intense: the entire interaction seems to have taken place in five to ten minutes, and Kerr got up and left the courthouse without incident after his fall. *See Adams*, 684 N.E.2d at 942. *Cf. Lopez*, 464 F.3d at 721 (holding that an arrestee plaintiff who officers kept shackled in an interrogation room for three to four days with minimal food and bathroom access stated a claim for intentional infliction of emotional distress).

As to the second prong of the claim, Kerr argues that he was "intentionally targeted and harassed to the point of causing severe emotional distress," Pl. Resp. 20; however, he presents no

evidence of Weikert's intent to inflict severe emotional distress, other than a vague reference to the fact that the political nature of his hat may have made him a target (though the record does not indicate that either Weikert or Loy made reference to anything other than the neutral "no hats" rule). Gross negligence or recklessness in performing one's duties does not provide proof that an officer intended to cause severe emotional distress. *See Davenport v. City of Chicago*, 653 F. Supp. 2d 885, 890, 895 (N.D. Ill. 2009) (finding no intent to inflict severe emotional distress where, upon arrest, plaintiff's personal belongings were thrown away and officers called her "nasty" while denying bathroom access). Therefore, Weikert's intent to inflict emotional distress may not be inferred solely from the conduct of using basic policing tactics to subdue Kerr.

Regardless of his intent, Weikert's actions were not extreme or outrageous, and while Kerr's emotional distress may be real, it cannot, alone, serve as the basis for his claim. Based on the facts presented by Kerr, no reasonable jury could that Weikert's actions constituted an intentional infliction of emotional distress. Summary judgment is granted as to Count III.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment on Count I is DENIED. Defendant's Motion for Summary Judgment on Count III Intentional Infliction of Emotional Distress, is GRANTED. The only claims remaining for trial are Plaintiff's Fourth and Fourteenth Amendment claims in Count I.

Entered September 29, 2016

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
